IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

BRANDON BLACKMON,            )
                                    )
                Plaintiff,   )    **CIVIL ACTION**
                                    )
v.                              )    No. 05-1029-MLB
                                    )
THE BOARD OF COUNTY COMMISSIONERS )
OF SEDGWICK COUNTY, KANSAS,    )
et al.,                     )
                                    )
                Defendants.  )

## MEMORANDUM AND ORDER

This case comes before the court on the following motions:

1)  Plaintiff's motions for partial summary judgment against all defendants (Docs. 268, 270, 272, 274, 276) and memoranda in support (Docs. 269, 271, 273, 275, 277, 278), defendants' responses (Doc. 293, 295) and plaintiff's reply (Doc. 309); and

2)  Defendants' motion for summary judgment (Doc. 283) and memoranda in support (Docs. 284, 286), plaintiff's responses (Docs. 296, 299) and defendants' replies (Docs. 316, 317).

I.  **Facts[1] and Procedural History**

---

[1] All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to the non-moving party. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). To the extent relevant, the factual disagreements between the parties will be noted. The court has not included statements that are irrelevant to the analysis at hand. See Adler, 144 F.3d at 670 ("[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim.").

### A. Parties[2]

In 1996, Brandon Blackmon was ten years old[3] and living in Wichita, Kansas, with his mother, Veronica Blackmon. Blackmon was placed at the Juvenile Detention Facility (JDF) for periods during 1996 and 1997.[4]

Defendant the Board of County Commissioners (Sedgwick County) is the governing board for Sedgwick County. Sedgwick County operates JDF and the Juvenile Residential Facility (the Shelter). JDF is a secure detention facility for children alleged to be delinquent or adjudicated delinquent and awaiting placement. The Shelter is a residential detention facility located adjacent to JDF and housed juveniles. The individual defendants in this case were all employees of Sedgwick County in 1997.

Defendant Natasha Tyson was an Assistant Shift Supervisor at JDF. Tyson graduated from Wichita State University in 1995 with a degree in Sociology and Administration of Justice. Tyson began her employment at JDF in 1995 and completed the required amount of training while employed at JDF.

Defendant Keith Gutierrez was a Senior Corrections Worker at JDF.

Defendant John Hittle was a Shift Supervisor at JDF and began his employment in 1989. Hittle completed all training requirements

---

[2] The facts set forth in this section discuss the status and employment of all parties during the relevant time period.

[3] Blackmon's date of birth is January 29, 1986.

[4] Blackmon's claims include events which occurred from January 31, 1997, to May 7, 1997.

at JDF during 1997.

Defendant Joan Fitzjarrald was a Senior Social Worker and Mental Health Coordinator at JDF.  Fitzjarrald received a Master's degree from the School of Social Work at Kansas University.  Fitzjarrald's duties included counseling youth, assisting with psychiatric care, performing assessments, clinical management of youth in crisis and supervising the Mental Health unit.

Defendant Kirk Taylor was employed by JDF as a Counselor and/or Senior Social Worker.[5]  Taylor held a Master's degree in Educational Counseling and School Psychology from Wichita State University.  Taylor was not a licensed social worker[6] and had not had any prior experience with juveniles.  Blackmon was Taylor's client while he was detained at JDF.

Defendant Marla Sutton was the Facility Manager for JDF and the Shelter.  Sutton received a Bachelor's of Science degree in Human Resources Management from Friends University in 1989.  Sutton supervised the day-to-day operations of JDF and had responsibility for the Mental Health unit, which consisted of Fitzjarrald and Taylor.

Mark Masterson[7] was the Youth Services Administrator for Sedgwick County Department of Corrections and was Sutton's supervisor.

---

[5] Defendants admit that Taylor was referred to as a social worker but claim that Taylor's job duties only included counseling and did not require Taylor to perform the job duties of a social worker, which included assessing and diagnosing the juveniles.

[6] The Sedgwick County job posting for the Senior Social Worker position required a Master's degree in Social Work and a State Behavioral Sciences Regulatory Board (BSRB) license.

[7] The court dismissed Masterson from this case in a prior order. See Doc. 113.

Masterson was the final policymaker as to all matters pertaining to JDF and he was responsible for the training programs.

## B. Relevant Policies and Procedures at JDF

JDF was subject to certain requirements set forth in the Kansas Juvenile Justice Code, K.S.A. 38-1601, et seq., the Kansas Care of Children Code, K.S.A. 39-1501, et seq., and the Kansas Administrative Regulations (K.A.R.) 28-4-351 through 28-4-360.  The policies at JDF required employees to meet the Kansas requirements for their profession.  In addition, JDF employees were required to receive eight hours of initial orientation, thirty-two additional hours of orientation prior to assuming independent responsibility for supervision of juveniles, and forty hours of in-service training every year.  The in-service training included topics such as licensing regulations, suicide prevention, use of restraints and child care practices.  Taylor did not receive the training required during his first year at JDF in 1996.

In March 1996, Masterson purchased two Pro-Straint Restraining Chairs, Violent Prisoner Chair Model RC-1200DLX, a type of restraint chair, for use at JDF.[8]  Prior to purchasing the chairs, Masterson did not inquire as to whether the chairs were being used in other juvenile facilities.  The chairs were purchased to prevent injury to a juvenile or JDF staff member during transportation of a juvenile to the intake area or isolation room.  JDF staff, with the exception of Fitzgarrald,

---

[8] Blackmon asserts that the restraint chairs purchased were for adult use only.  (Doc. 296 at 39).  The materials from the manufacturer, however, discuss transporting children in the chair. (Doc. 280, exh. 30 at 16514).

The restraint chairs were not used in the Shelter.

were trained to transfer a juvenile to the chair in handcuffs, belly chains and leg irons.[9]  Once placed in the restraint chair, JDF staff were to remove the "hard" restraints and replace them with the "soft" restraints attached to the chair.   The chair had straps for the wrists, waist, chest and ankles.

JDF policy set forth provisions for the use of mechanical restraints.  The mechanical restraints were to be used as a temporary control measure in certain circumstances, including instances when staff needed to protect a juvenile from self-injury, but they were never to be used for the purpose of punishment or discipline.  The policy on mechanical restraints did not indicate whether staff had to first utilize less restrictive methods prior to utilizing the mechanical restraints.  Mechanical restraints, however, could only be authorized by the youth care supervisor or facility manager, except during emergencies.  JDF staff was instructed to notify Fitzjarrald or Taylor of the use of restraints if they were on duty.   The restraints could be removed when the facility manager, mental health professional[10] or youth care supervisor determined that the juvenile's behavior was in control.  The restraints were not to be used for longer than thirty minutes except with permission of Sutton or Masterson.  After using mechanical restraints, JDF staff were required to complete a "Use of Force" report which was placed in the juvenile's file and forwarded to the mental health professionals and the facility

---

[9] The parties dispute the quality of the training that was given to Taylor.  Taylor received an instruction from two adult corrections officers during his first year at JDF.

[10] JDF policies state that a mental health care professional is one who is licensed by the BSRB.

manager.

### C.  Events Leading up to Blackmon's Placement at JDF

On April 15, 1996, Blackmon wrote in wet cement on a driveway located in Wichita.  As a result, Blackmon was charged as a juvenile offender on May 7.  On May 23, Blackmon was arrested by the Wichita Police Department on allegations of rape and placed in JDF.  On May 24, Blackmon was charged with committing rape with a child under 14 years of age or, in the alternative, to have lewdly fondled or touched a child under 14 years of age.  Blackmon was released on a $500 appearance bond to the custody of his mother.  Judge Carol Bacon ordered Blackmon's mother to sign a protection agreement and obtain a psychological evaluation for Blackmon.  The court also ordered Margo Crile, a social worker employed by the state of Kansas, to enter Blackmon's case because he was an alleged juvenile offender.[11] Blackmon, however, was not placed in the custody of SRS at that time.

Due to a miscommunication, Blackmon was arrested on the evening of the 24th and sent to the Shelter where he remained until May 28. During his time at the Shelter, Blackmon was called names and given a "swirly" by another resident.[12]  Blackmon was transferred to JDF on May 28 because he tore a screen in the window of his room and failed to comply with the Shelter staff.  Blackmon was released from JDF on the following day.  While at JDF, Blackmon was placed with the female residents and did not experience any physical assaults.

---

[11] Crile was a defendant in a case filed by Blackmon in 2005, <u>see</u> Case no. 05-1030-MLB.  That case was resolved in December 2009.

[12] Blackmon's head was placed in the toilet and the toilet was then flushed.

On June 5, Blackmon was evaluated by Dr. Howard Brodsky.  Dr. Brodsky also conducted therapy sessions with Blackmon on June 12, 19 and September 19.   Blackmon's trial for the alleged rape charges was set on December 4.   Prior to this date, Blackmon traveled to Little Rock, Arkansas.  Blackmon did not return to Kansas for the December 4 trial date.  On December 5, the court issued a bench warrant for Blackmon.  Blackmon was arrested in Arkansas and returned to Kansas. On December 19, a detention hearing was held.  Judge Burgess ordered that Blackmon not leave Wichita area and he was released to his mother.  Blackmon was also ordered to attend counseling.

On January 9, 1997, Roy Voth, a Licensed Specialist Clinical Social Worker, evaluated Blackmon and diagnosed him with adjustment disorder.   Voth opined that Blackmon's condition was short term and that his prognosis was good.  Blackmon saw Voth again on January 21. Voth's progress notes stated that Blackmon's "problem" was "behavior and school" issues.

### D. JDF Placement

On January 29, 1997, Blackmon turned eleven years old.   On January 31, 1997, the "adjudicatory trial" in Blackmon's alleged rape case was set to begin.   The trial was not held on that date, however. Instead, Judge Bacon ordered that Blackmon be detained because he was dangerous to himself and others and was not likely to appear for future proceedings.   Judge Bacon informed Blackmon that he would be placed at the Shelter and would be able to continue to go to school. The judge described the Shelter as unlocked and made Blackmon assure her that he would not run away.   The judge then entered a writ to detain which stated that Blackmon was to be detained in the Juvenile

-7-

Detention Facility. The writ also had a section which states "ORDERS ENTERED." This section has several options for placement and reflects that the judge ordered placement at the Shelter.

Blackmon was not placed at the Shelter on January 31. Instead, Blackmon was placed at JDF because the Shelter's director, Lynda Lambert, refused to accept Blackmon due to his prior behavior in May 1996.[13] When Blackmon entered JDF, he was 4'11" tall and weighed less than 100 pounds. The other juveniles towered over Blackmon. Blackmon was physically, emotionally and sexually immature in comparison to most of the juveniles at JDF but did not have a diagnosable mental health condition. At intake, Blackmon was assessed by staff for suicide risk. Blackmon was upset, crying, nervous and scared. The staff at JDF did not take a social history for Blackmon to determine his mental health needs. There is no indication that the intake assessment was reviewed by the mental health staff at JDF and an assessment was not performed by the mental health staff.

On February 2, Blackmon began to self-harm by banging his head on the wall which resulted in a knot on his forehead. JDF mental health staff were to review the incident and talk with Blackmon but there is no indication that this ever occurred. On February 6, Blackmon hit his forehead on either the wall or the door and had a bump on his forehead. Fitzjarrald met with Blackmon and determined that he was "fine." Fitzjarrald threatened to put Blackmon in a paper gown in the intake area if he continued his behavior.

---

[13] On February 6, Blackmon met with staff from the Shelter regarding a potential placement. However, on February 11, Lambert declined Blackmon's placement due to his behavior at JDF and because Sutton advised her of Blackmon's constant trouble at JDF.

-8-

On February 8, Blackmon had an emotional outburst and threatened to hit his head on the wall after he learned that he was not going to be transferred to the Shelter. Five minutes later, between 8:30 and 8:40 p.m., Tyson told Blackmon to lie on his stomach and Tyson placed mechanical restraints on his wrists and ankles. Blackmon hit his head on the wall after the application of the restraints. Approximately twenty minutes later, Blackmon was placed in the restraint chair because JDF staff believed the time limit for mechanical devices was about to expire. Once in the restraint chair, the soft restraints were used. Blackmon cooperated with the staff. There is no indication that JDF staff used other methods to de-escalate Blackmon. At 9:00 p.m., Taylor was called to assess Blackmon. Sutton was also called and she authorized the extended use of mechanical restraints. Taylor arrived at 9:30 and Blackmon was released to his room at some point between 9:45 and 10:00 p.m.

Due to Blackmon's behavior, he was placed on Disciplinary Detention Time (DDT) and was locked in his room from February 8 until February 13. JDF were required to observe Blackmon every fifteen minutes during the DDT. The JDF staff did not hold a staffing after Blackmon's DDT even though the policy requires a staffing after a juvenile is in detention for more than 72 hours. The staffing is to develop an appropriate emergency plan for the juvenile.[14] Blackmon attempted to appeal the DDT and made a request to Taylor, however

---

[14] The emergency staffing procedures are somewhat varied in other situations. When a juvenile has been placed in restraints on more than 4 occasions in a 30 day period, an emergency staffing is to be held in which staff determine the appropriateness of the placement in addition to developing an emergency plan.

there is no indication on the record that Blackmon's appeal was heard.

On February 9, Blackmon was placed on high suicide watch by Fitzjarrald.  His suicide watch continued until February 19.  JDF staff did not hold an emergency staffing as a result of the suicide watch as is required by Kansas regulation.  Moreover, Fitzjarrald did not complete a mental health assessment of Blackmon or develop a mental health plan after placing him on suicide watch.

At 6:45 p.m. on February 9, Tyson was called to Blackmon's room because JDF staff discovered that Blackmon had a bump on his forehead and his left eye was blackened.  Tyson paged Dr. Melhorne, a medical doctor, who indicated that Blackmon was not in any danger from the injury.  Fitzjarrald was contacted because Blackmon was threatening self-harm and she instructed Tyson to place Blackmon in the restraint chair if his behavior continued.  Without any indication in the record as to Blackmon's behavior, JDF staff put a helmet on Blackmon and placed him in the restraint chair at 7:40 p.m.  Sutton was called at 7:55 p.m. and she authorized the extended use of restraints if Blackmon had not de-escalated.  Fitzgarrald was contacted again and asked to assess Blackmon.  At 8:00 p.m., Blackmon began screaming.  At 8:10 and 8:20 p.m., Blackmon was screaming and crying.  Blackmon was finally removed from the chair at 8:30 p.m. and returned to his room.  Fitgarrald had not yet arrived.

On February 10, both of Blackmon's eyes were black and swollen.  Blackmon again threatened to harm himself.  A physician assistant evaluated Blackmon and prescribed ice packs and pain medication.  Masterson contacted Darwin Dorr, Ph.D., to conduct a psychological assessment of Blackmon.

-10-

On February 11, Lambert denied Blackmon's transfer to the Shelter. Lambert partially based this decision after input from the "population committee," which was a standing meeting where JDF and Shelter employees would discuss individuals at JDF who might benefit from the less restrictive environment at the Shelter. After February 11, Blackmon was never considered for placement at the Shelter.

On February 10, 11, and 12, Blackmon did not receive any mental health services from Fitzjarrald or Taylor even though he was on high suicide watch. On February 12, Blackmon again threatened to harm himself.

On February 13, Taylor lowered Blackmon's status to precautionary suicide watch. Later that day, Blackmon was playing basketball in the gym and got into an altercation with another juvenile after the juvenile made remarks about Blackmon's family. Blackmon threw the basketball at the juvenile and the juvenile punched Blackmon in the face. Between 6:15 and 6:25 p.m., Blackmon was escorted to the intake area and he threatened to hit his head. Tyson placed Blackmon in the restraint chair. Blackmon was removed from the chair after twenty-five minutes. At 7:35, Blackmon was kicking the wall, crying and banging his head on the wall. At 7:45, Taylor went into Blackmon's room to talk with him. At 8:00 p.m., Blackmon was physically removed from his room and taken to the intake area after Tyson was called and she approved the use of the restraint chair. At 8:10 p.m., Blackmon was strapped into the restraint chair with soft restraints. Blackmon was able to remove his hands from the soft restraints. The JDF staff then placed the mechanical restraints on Blackmon. At some point, Sutton was contacted and authorized extended

-11-

use of the restraints.  Blackmon remained in the chair for 80 minutes. Blackmon was given 24 hours of detention time as a result of the incident.

On February 14, Fitzjarrald returned Blackmon to high suicide watch.  Again, Fitzjarrald did not perform a mental health assessment or prepare a mental health plan for Blackmon.  Fitzjarrald met with Kendrick, a physician assistant, who spoke to Dr. Whitter and Masterson.  They were trying "to keep this kid from banging his head so [they] can get his face healed up. . . Hopefully staff can keep him from banging so his face has a chance to heal."  (Doc. 284 at 23). Fitjarrald also instructed the following: "1. [Taylor and Fitzjarrald] will see this kid 2 times on their shift; 2. No room time alone; 3. Sleeps in dayroom; 4. DAF-restraint chair; 5. Any DDT he has to serve, 1:1 person must serve with him, or by the door with the door open; 6. Quiet time in the dayroom; [and] 7. Shadow for activities for meals and school."  (Doc. 284 at 23-24).   The record does not reflect whether Taylor and Fitzjarrald met with Blackmon twice a day.

On February 15, JDF staff member Daryl Smith sat on Blackmon after he refused to do what he was told.  Gutierrez allowed Smith to sit on Blackmon.  Blackmon had pain on his side and chest as a result. Gutierrez determined that Blackmon had the wind knocked out of him. On that same date, while Blackmon was in the gym, he placed the volleyball rope around his neck.  From February 15 to 18, Blackmon did not receive any mental health services from Fitzjarrald.

On February 16, Blackmon hit his head against the wall three times.  On February 17, Blackmon was interviewed by Dr. Dorr for approximately one hour.  Dr. Dorr's assessment concluded that Blackmon

-12-

was depressed and experiencing despair, despondency and frustration related to his incarceration. Dr. Dorr opined that acting out these emotions by banging his head and he informed Blackmon that continued head banging will increase his incarceration. Dr. Dorr opined that the head banging "seems to have" ceased since Blackmon had "been instructed" that it would result in further incarceration. (Doc. 285, exh. 61 at 4)[15]. Dr. Dorr did not recommend hospitalization or on-going psychiatric treatment.

On February 19, Taylor removed Blackmon from suicide watch. Taylor noted in the Supervisor's Log that Blackmon would be "punished" if he banged his head by being strapped in the restraint chair or he would be put in a paper gown and placed in intake for any other infraction. Taylor also noted that he had warned Blackmon of these repercussions in the dorm log.

Blackmon continued to threaten to harm himself on February 24 and March 7. On March 6, Blackmon wet his bed. On March 7, Blackmon's adjudication continued and Blackmon was found guilty of rape.[16] Judge Bacon ordered that Blackmon remain at JDF and informed Blackmon that the court would consider a possible release to the Shelter at a later date.

That evening, Blackmon was placed on intensive suicide watch by Fitzjarrald. Again, Fitzjarrald did not perform an assessment, develop a mental health plan or schedule an emergency staffing.

---

[15] The record does not clarify who instructed Blackmon that his head banging would result in further incarceration.

[16] On March 13, 1998, the Kansas Supreme Court reversed Blackmon's adjudication for rape. See In the Matter of B.M.B., 264 Kan. 417, 955 P.2d 1302 (1998).

Blackmon remained on suicide watch until March 25. JDF staff did not hold an emergency staffing as a result of Blackmon's suicide watch.

On March 9, Blackmon hit his head against the wall. On March 10, at approximately 8:20 p.m., Gutierrez was called to Blackmon's room because Blackmon was crying, saying that he wanted to kill himself and that he was going to bang his head. Five minutes later, Blackmon was placed in the restraint chair in the recreation area with his hands handcuffed and his legs shackled. Blackmon was released after forty-five minutes but placed in the supervisor's office until Taylor arrived. Taylor was called at 8:40 but staff did not speak to Taylor until 9:45. Blackmon was placed on high suicide watch by Taylor. Again, JDF staff failed to prepare a mental health plan and hold an emergency staffing. Also, Blackmon did not receive any mental health services from Fitzjarrald from March 11 to March 22.

On March 11, Blackmon participated in a Community Mental Health Center Screening Assessment after a referral from Crile. Blackmon showed evidence of severe maladaptive or serious destructive behaviors, conduct disorder, anxiety disorder and was considered to be seriously emotionally disturbed. It was recommended that Blackmon be placed in a safe, structured and secure environment, that included medication evaluation, a 24 hour structured therapeutic milieu and hospital treatment. Blackmon was pre-admitted to Prairie View Hospital but there was not a bed available for Blackmon on that day.

On March 12, Judge Bacon held a hearing in the wet cement case. Blackmon entered an admission to the charge. Judge Bacon entered an order placing Blackmon in SRS custody and requiring a comprehensive medical and psychiatric evaluation. Later that day, Taylor noted that

-14-

any special incident or detention time would be served in a holding room while Blackmon was wearing a paper gown and the chair would be utilized if needed.   Taylor then advised staff as to the location of the paper gowns.   Taylor spoke with Blackmon and informed him that he would expect to arrive at the intake area if he was called in by staff to assist with Blackmon, inferring that Blackmon would be in the holding room which is in the intake area.

On March 14, Greg Martin was involved in de-escalating a horseplay situation between Blackmon and another juvenile in the gym. Martin noted that the paper gown will be used if Blackmon failed to serve the detention time without problems.   Martin sent the note to Sutton, Fitzjarrald and Taylor.   Later that evening, Blackmon threatened to kill himself and was placed on high suicide watch.   On March 16, Blackmon again threatened to kill himself.

On March 17, between 8:35 a.m. and 8:45 a.m., Blackmon became upset after receiving 24 hours of detention time and being put in his room.   Blackmon hit his head on the door, causing his forehead to swell.   Blackmon refused to walk to intake and JDF staff carried him in a hold.   Blackmon was placed in handcuffs, shackles and the restraint chair.   After a couple of minutes, Blackmon attempted to free himself.   Abel Tsimonjela, a JDF staff member, removed Blackmon from the chair, removed his clothing with the exception of his underwear, placed him in a paper gown and returned him to the chair. Blackmon was released from the chair after approximately five to twenty minutes in restraints.   Blackmon was seen by Kendrick two days later.   Kendrick noted that Blackmon had a head contusion with edema and ecchymosis.

On March 23, Blackmon threatened to bang his head on the brick wall and threatened to squeeze his hand until his bone popped out. On March 24, between 8:23 and 8:40 p.m., Tyson discovered Blackmon in his room with socks around his neck.  Tyson and Gutierrez escorted Blackmon to the holding room where his clothing was removed and he was placed in the paper gown.  On the way back to his room, Blackmon banged his head on a door.  Blackmon was placed in a hold, carried back to the intake area and placed in the restraint chair.  Sutton was notified of the incident and authorized the extended use of mechanical restraints.  Blackmon remained in the restraint chair for 60 minutes. Blackmon was placed on intensive suicide watch by Taylor.  Again, JDF staff failed to prepare a mental health plan and hold an emergency staffing.

Blackmon participated in another screening on March 25. Blackmon received the same recommendations and diagnosis as were given on March 11.  Dr. Flanders noted that Blackmon was depressed, had decreased appetite and sleep disruption.  Blackmon was admitted to Providence Hospital in Kansas City, Kansas.  Blackmon was prescribed medications after being diagnosed with adjustment disorder and depression.  Blackmon also received psychotherapy.  Blackmon did not exhibit any self-abusive behaviors or any aggressive behaviors while at the hospital.  Blackmon was discharged on April 4 and returned to JDF.

On April 8, Blackmon attempted to wrap his pillowcase around his neck, threatened to kill himself and was crying.  Blackmon again threatened to harm himself on April 10, 12 and 13.  On April 12, Blackmon was placed on high suicide watch by Fitzjarrald.  Again,

Fitzjarrald did not perform a formal mental health assessment or develop a mental health plan. An emergency staffing did not occur. On April 13, Blackmon also hit his head on the wall several times. Blackmon remained on suicide watch until May 7. JDF staff did not have an emergency staffing to discuss Blackmon's current suicidal status. Fitzjarrald did not provide any mental health treatment to Blackmon from April 13 to April 16. On April 14, Dr. Romalis, a psychiatrist, met with Blackmon. Romalis prescribed an antidepressant for Blackmon after diagnosing him with adjustment disorder with a depressed mood. Blackmon told Romalis that his head-banging was "in reaction to feeling I don't deserve to live because they mistreat me at JDF." (Doc. 296 at 146). On April 17, Taylor placed Blackmon on precautionary suicide watch.

Between April 17 and 19, Blackmon was evaluated by Mark Chaffin, Ph. D., at the request of Blackmon's mother. Chaffin concluded that Blackmon had serious depression which was directly related to his current circumstances. Chaffin also met with Taylor and Fitzjarrald who expressed that Blackmon was doing poorly at JDF and that JDF was an improper placement for Blackmon because of his age and size. Additionally, Fitzgarrald told Chaffin that she did not think that black children got depressed. In Chaffin's opinion, the JDF records revealed a clear pattern of emotional and behavioral deterioration in Blackmon. At the time of his report, Chaffin did not know that Blackmon had been placed in a restrain chair on several occasions.

On April 19, Blackmon stated that he wanted to kill himself and that he felt the walls were closing in on him. On April 20, Blackmon threatened to choke himself with a towel. On April 22, Blackmon had

a sweatshirt around his neck and was attempting to choke himself with his hands.   Blackmon met with Dr. Romalis who noted that Blackmon still felt depressed and sad.   On April 25 and 28, Blackmon hit his head against the wall.   Blackmon was placed on high suicide watch by JDF shift supervisor Abel Tsemonjela.   Again, the watch was initiated without a formal mental health assessment or a mental health plan. Also, an emergency staffing did not occur after the high suicide watch period ended.   On April 29, Blackmon inserted his finger in his throat and vomited.

On May 1, at approximately 9:35 a.m., Blackmon had to leave the school area of the facility due to misconduct.   A few minutes later, Hittle found Blackmon scratching himself and attempting to tie a sheet around his neck.   Blackmon told Hittle that he was going to kill himself.   Blackmon was placed in the restraint chair with soft restraints.   After some time in the chair, Hittle asked Blackmon if he would like to return to his room.   Blackmon told Hittle that he would harm himself if he returned to his room.   Blackmon remained in the restraint chair.   The record does not clarify if authorization was given for the extended use of restraints.   Blackmon remained in the restraint chair for approximately two hours.

On May 2 and May 5, Blackmon threatened to harm himself and bang his head on the wall.   On May 7, Blackmon was transferred to St. Francis Academy.   At that time, Blackmon was severely emotionally disturbed.   Blackmon had not received any mental health services from Fitzjarrald from April 26 through his discharge on May 7.

During Blackmon's confinement at JDF, Sutton spoke to Taylor and Fitzjarrald about Blackmon every day.   Sutton was also responsible for

-18-

evaluating the incidents of restraint and was aware of every incident of restraint with respect to Blackmon.  Sutton was aware that JDF staff did not have a single emergency staffing to discuss the use of mechanical restraints or Blackmon's suicidal watch status.

### E.  Current Motions

Defendants have moved for summary judgment on the basis of qualified immunity.  Blackmon has moved for partial summary judgment against all defendants.

## II.  Summary Judgment Standard

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists so that a rational trier of fact could resolve the issue either way and an issue is "material" if under the substantive law it is essential to the proper disposition of the claim.  Adamson v. Multi Community Diversified Svcs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. Analysis

Pursuant to 42 U.S.C. section 1983, any person who "under color of . . . [law] . . . subjects, or causes to be subjected, . . . any [person] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  Section 1983 was enacted to provide protections to those persons wronged by the misuse of power.  While the statute itself creates no substantive civil rights, it does provide an avenue through which civil rights can be redeemed.  See Wilson v. Meeks, 52 F.3d 1547, 1552 (10th Cir. 1995).  To state a claim for relief in a section 1983 action, Blackmon must establish that he was (1) deprived of a right secured by the Constitution or laws of the United States and (2) that the alleged deprivation was committed under color of state law.  See Am. Mfr's. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).  There is no dispute that defendants were acting under color of state law.

### Qualified Immunity

While section 1983 permits the possible vindication of a plaintiff's rights, non-meritorious suits exact a high cost upon society and law enforcement personnel.  See Anderson v. Creighton, 483 U.S. 635, 638 (1987). In order to balance the competing interests, government officials performing discretionary duties are afforded qualified immunity shielding them from civil damages liability. Pearson v. Callahan, 129 S. Ct. 808, 815, 172 L. Ed.2d 565 (2009). Qualified immunity protects these officials unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known."  Id.; Baptiste v. J.C.

Penney Co., Inc., 147 F.3d 1252, 1255 (10th Cir. 1998). The defense not only provides immunity from monetary liability, but perhaps more importantly, from suit as well. See Horstkoetter, 159 F.3d at 1277.

When a defendant claims qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a constitutional right and (2) demonstrating the right allegedly violated was "clearly established" at the time the conduct occurred. Pearson, 129 S. Ct. at 815-16. As noted in Pearson, courts are no longer required to follow the two-step sequence mandated by Saucier v. Katz, 533 U.S. 194 (2001). Id. at 818. "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. The court will first address the clearly established prong.

## Clearly Established Constitutional Right

The court must determine whether the rights at issue were sufficiently clear that defendants would have understood that their conduct violated a constitutional right that was clearly established at the time the alleged acts took place. See Cruz v. City of Laramie, 239 F.3d 1183, 1187 (10th Cir. 2001); Watson v. University of Utah Med. Ctr., 75 F.3d 569, 577 (10th Cir. 1996). This standard, however, must be used in a particularized manner[17] because "[o]n a very general

---

[17]     The Tenth Circuit "has held that for a right to be 'particularized,' there must ordinarily be a Supreme Court or Tenth Circuit decision on point, or 'clearly established weight of authority' from other courts." Wilson v. Meeks, 52 F.3d 1547, 1552

level, all constitutional rights are clearly established." <u>Horstkoetter</u>, 159 F.3d at 1278. Were this level of particularity not required, <u>Harlowe</u> "would be transformed from a guarantee of immunity into a rule of pleading," that would "destroy 'the balance that [Supreme Court] cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties.'" <u>Anderson</u>, 483 U.S. at 639-40 (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984)).

Blackmon contends that defendants violated his clearly established rights to be free from harm, free from unreasonable bodily restraint, to be placed in a safe environment and to receive appropriate care and treatment. Defendant responds that the law was not clear pertaining to the use of juvenile restraints and the right to receive treatment in a juvenile facility.

Contrary to defendant's contentions, the United States Supreme Court held in <u>Youngberg v. Romeo</u>, 457 U.S. 307, 315-316, 102 S. Ct. 2452, 2458 (1982), "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action. This interest survives criminal conviction and incarceration. Similarly, it must also survive involuntary commitment." (internal citations omitted). In <u>Milonas v. Williams</u>, 691 F.2d 931, 942 (10th Cir. 1982), the Tenth Circuit held that a juvenile "has the right to reasonably safe conditions of confinement, the right to be free from unreasonable

---

(10th Cir. 1995); <u>see also</u> <u>Cruz v. City of Laramie</u>, 239 F.3d 1183, 1187 (10th Cir. 2001); <u>Horstkoetter v. Dept. of Public Safety</u>, 159 F.3d 1265, 1278 (10th Cir. 1998).

bodily restraints, and the right to such minimally adequate training as reasonably may be required by these interests." (citing Youngberg, 457 U.S. 307.)  Therefore, the right to be free from unreasonable bodily restraints was clearly established in 1997.  Defendants' argument that the restraints were reasonable in light of Blackmon's behavior is not applicable in determining whether the right was clearly established, but rather will be addressed in determining whether Blackmon's rights were violated.

Turning to the right to receive mental health treatment, defendants' argument is centered on the legal standard used to determine if the right has been violated.  Defendants do not appear to assert that Blackmon's right to treatment was not established in 1997.  The State has a constitutional obligation "to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976).  "This includes medical treatment for inmates' physical ills, dental care, and psychological or psychiatric care." Ramos v. Lamm, 639 F.2d 559, 574-575 (10th Cir. 1980)(internal citations omitted).  This right applies to pretrial detainees as well.  See Bee v. Greaves, 744 F.2d 1387, 1395 (10th Cir. 1984).

Additionally, Blackmon "is entitled to be confined in an environment which does not result in his degeneration or which threatens his mental and physical well being." Battle v. Anderson, 564 F.2d 388, 403 (10th Cir. 1977).

Therefore, the rights identified by Blackmon were sufficiently clear that defendants would have understood that certain conduct violated a constitutional right at the time the alleged acts took

place.

## Violation of Constitutional Right

To determine whether Blackmon has sufficiently shown the violation of a constitutional right, this court must determine whether the uncontroverted facts and the controverted facts viewed in the light most favorable to Blackmon state a claim for a violation of a constitutional right. See Romero, 45 F.3d at 1475 (relying in part upon Siegert v. Gilley, 500 U.S. 226, 231-32 (1991)). Determining whether a plaintiff has stated a claim for a constitutional violation is purely a legal question. See id. Despite the inevitable factual issues that become intertwined in the characterization of a plaintiff's precise constitutional claims, this court cannot avoid the legal issue by simply framing it as a factual question. See Archer v. Sanchez, 933 F.2d 1526, 1530 n.7 (10th Cir. 1991).

### A.    Violations of Regulations and Policies

Throughout Blackmon's briefing he asserts that defendants consistently violated numerous Kansas State regulations and JDF policies.  Blackmon contends that these violations resulted in a violation of his constitutional rights, i.e. Blackmon's right to be free from unreasonable restraint was violated because the restraints were in place longer than the regulation allowed.  Defendants respond that a violation of a regulation or policy does not equate with a violation of a constitutional right.

"A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes.  But not 'all common-law duties owed by government actors were . . . constitutionalized by the Fourteenth Amendment.'"  DeShaney v.

-24-

Winnebago County Dep't of Social Servs., 489 U.S. 189, 202, 109 S. Ct. 998, 1007 (1989) (quoting Daniels v. Williams, 474 U.S. at 335). Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.  Baker v. McCollan, 443 U.S. 137, 99 S. Ct. 2689 (1979). "Remedy for the latter type of injury must be sought in state court under traditional tort law principles." Id. at 146.

Blackmon cites to Doe v. New York City Dept. of Soc. Servs., 709 F.2d 782, 791 (2d Cir. 1983), in support of his position that the violation of state licensing standards and policies "help explain the several ways in which defendants violated Brandon's rights." (Doc. 299 at 15). Doe, however, is distinguishable from this case.  In Doe, the defendant failed to report suspected child abuse as required by state statute.  The court held that the defendant failed to comply with statutory duties but the court also held that the failure to report showed a pattern of indifference which resulted in the plaintiff's continued abuse.  Moreover, the regulations at issue in this case were either set by the Kansas Department of Health or created by Masterson at JDF, not the legislature of the State of Kansas.

In Tanberg v. Sholtis, 401 F.3d 1151 (10th Cir. 2005), the Tenth Circuit held that administrative standards cannot serve as the basis for the protection of civil liberties.  The Circuit reasoned that this would disserve the objective of protecting civil liberties because these regulations could be set in excess of the federal constitutional minima and therefore, the court "would create a disincentive to adopt progressive standards." Tanberg, 401 F.3d at 1164.  Because the

regulations and policies do not confer federal constitutional rights, the violation of these regulations and policies do not automatically equate with a violation of Blackmon's constitutional rights.   The standards  may,  however,  be  persuasive  in  determining  whether Blackmon's rights were violated.[18]   See Lopez v. LeMaster, 172 F.3d 756, 761 (10th Cir. 1999).

### B.   Constitutional Standard

Blackmon  has  brought  this  action  pursuant  to  the  Fourteenth Amendment.   However,  actions  which  are  protected  under  specific constitutional provisions are analyzed under those provisions and not under the more generalized provisions of "substantive due process." See Berry v. City of Muskogee, Okl., 900 F.2d 1489, 1493 (10th Cir. 1990)(citing Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, (1989)). Blackmon asserts that the professional judgment standard applies as set forth in Youngberg v. Romeo, 457 U.S. 307 (1982) and Yvonne L. v. New Mexico Dept. of Human Servs., 959 F.3d 883 (10th Cir. 1992). Those cases are factually different than this case as they addressed the constitutional standard applicable when a state takes custody of a child in need, in either a mental health situation or foster care, not a juvenile delinquent.[19]

---

[18]   The  relevant  regulations  and  policies,  therefore,  would presumably be admissible during trial with an appropriate limiting instruction for the jury.

[19] While the court utilized the professional judgment standard in Blackmon  v.  Crile,  No.  05-1030,  the  facts  in  that  case  were significantly  different  than  those  faced  here  even  though  the plaintiff was the same individual.  In Crile, the court dealt with a violation  of  rights  by  social  workers  who  placed  Blackmon  in inappropriate placements.  Those facts shared similarities with other social  worker  cases,  such  as  Youngberg  and  Yvonne L.  However,  this case  more  closely  resembles  a  prison  confinement  case  even  though

The Tenth Circuit has held that a juvenile pretrial detainee in the custody of the state who challenges the conditions of confinement utilizes the same standard as an adult pretrial detainee. <u>Colbert v. Bd. of County Com'rs for Okl. County</u>, No. 10-6145, 2011 WL 692991, *5 (Mar. 1, 2011)(juvenile pretrial detainee at a juvenile detention center). "Although the Due Process Clause governs a pretrial detainee's claim of unconstitutional conditions of confinement, the Eighth Amendment standard provides the benchmark for such claims." <u>Id.</u> (citing <u>Craig v. Eberly</u>, 164 F.3d 490, 495 (10th Cir. 1998)). The Eighth Amendment requires officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." <u>Barney v. Pulsipher</u>, 143 F.3d 1299, 1310 (10th Cir. 1998).

To prevail on Blackmon's claims of failure to keep him safe from harm and providing adequate mental health care, he must satisfy the two-part test which includes both an objective and subjective component. The objective component requires Blackmon to establish that "he [was] incarcerated under conditions posing a substantial risk of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994). The subjective prong requires Blackmon to establish that the official had a "sufficiently culpable state of mind." <u>Id.</u> "In a case involving the failure to protect, as in other conditions-of-confinement cases, that state of mind is one of

---

Blackmon was a young child. Moreover, in its order entered more than five years ago (Doc. 113 at 10), the court set forth the standard in this case as deliberate indifference.

deliberate indifference to inmate health or safety." <u>Craig</u>, 164 F.3d at 495.  In other words, a state actor is liable only if he or she "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 496.

Turning to the use of restraints and Blackmon's right to be free from unnecessary bodily restraints, these claims are also analyzed under the Eighth Amendment. <u>See</u> <u>Miller v. Glanz</u>, 948 F.2d 1562, 1566 (10th Cir. 1991) (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S. Ct. 1078 (1986)). In "non-emergency situations or when the State's responsibility to the prisoner does not clash with other equally important governmental responsibilities, . . . deliberate indifference is the appropriate Eighth Amendment standard." <u>Id.</u> at 1566-67 (quotations and citations omitted).  However, when an emergency situation occurs, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 7, 112 S. Ct. 995 (1992)(citing <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S. Ct. 1078 (1986)).  When the use of mechanical restraints occurred due to Blackmon's self harm behavior and threats, the standard in <u>Whitley</u> and <u>Hudson</u> is applicable. <u>See</u> <u>Miller</u>, 948 F.2d at 1566.  When there is a dispute of fact as to whether the use of restraints was in response to a threat or emergency, the court will first determine whether the <u>Whitley</u> standard is met as it is more stringent and a defendant is acting with deliberate indifference if he acts maliciously and sadistically. <u>See</u> <u>Miller</u>, 948 F.2d at 1566.  If the

standard is not met, the claim will still survive summary judgment if Blackmon can establish that a defendant acted with deliberate indifference.

In addition to defining the mental state required, <u>Hudson</u> and <u>Whitley</u> outline five distinct factors relevant to ascertaining whether force was used "maliciously and sadistically for the very purpose of causing harm": (1) "the extent of injury"; (2) "the need for application of force"; (3) "the relationship between that need and the amount of force used"; (4) "any efforts made to temper the severity of a forceful response"; and (5) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them." <u>Whitley</u>, 475 U.S. at 321; <u>see also</u> <u>Hudson</u>, 503 U.S. at 7.

The court must now look to each individual defendant to determine whether he or she "acted under color of state law and caused or contributed to the alleged violation." <u>Smith v. Barber</u>, 195 F. Supp.2d 1264, 1274 (D. Kan. 2002); <u>Currier v. Doran</u>, 242 F.3d 905, 919 (10th Cir. 2001). Defendants do not dispute that they were acting under color of state law. Therefore, the court will turn to the question of whether each defendant violated Blackmon's constitutional rights using the standards set forth above.

**C.   Individual Defendants**

**1.   Mechanical Restraints**

All the defendant supervisors were involved in the application of the mechanical restraints. Taylor was also involved in certain incidents and Fitzgarrald was frequently contacted and authorized the use of mechanical restraints. Sutton was aware of each restraint that

occurred and also authorized the prolonged use of mechanical restraints on some occasions.  The court will not go through a second discussion of the events as they are all adequately set forth in the facts section of this order.  In addition to asserting that the use of restraints violated his constitutional rights, Blackmon has also established that the use of restraints on all occasions violated several regulations and JDF policies.  See K.A.R. 28-4-355B(d)(1)[20] and JDF Policy 3.112[21].

---

[20] Restraint. Each center shall have written policies and procedures which govern the use of restraint.
(1) Procedure and practice shall:
(A) Limit the use of physical restraint to instances of justifiable self-defense, protection of the juvenile or others, protection of property or prevention of escape;
(B) permit the use of physical restraint only when all other less restrictive methods of controlling the juvenile's dangerous behavior were either attempted and failed or diagnostically eliminated;
(C) prohibit the use of physical restraint as punishment.
(D) ensure that mechanical restraints are used within the secure parameters of the center only when required to move a juvenile to locked isolation. The use of mechanical restraints shall not exceed 30 minutes in duration. . .
***
(3) If a juvenile requires the use of mechanical restraints more than four times in any 30 day period, an emergency staffing shall be held to discuss the appropriateness of the juvenile's continued placement at the center and to develop an emergency plan for the juvenile.

[21] II. A. Physical handling is the first level of force available to staff. Physical handling is justified to separate participants in a fight, for self defense, for defending other staff, to protect other Juveniles, to prevent property damage or to prevent escape. Physical handling may also be used to move juveniles who fail to comply with lawful orders.

B. Use of mechanical restraints is the second level of use of force. This is the use of handcuffs and/or legirons. Mechanical restraints are used for the same reasons as physical handling, but only when authorized by the youthcare supervisor or facility manager (except during emergencies) and shall only be used for the length of time required for the juvenile to regain control of themselves. Mechanical restraints shall never be used for longer than 30 minutes except with the permission of the facility manager or the division administrator.

As discussed previously, the court will first utilize the <u>Whitley</u> standard to determine if defendants violated Blackmon's rights because there is a dispute as to whether each incident was an emergency. The question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. The factors to consider in judging the excessiveness of the force in question include the extent of the injury, the justification for the use of force, the relationship between the degree of force employed and the need that compels its use, the threat reasonably perceived by prison officials, and efforts made to temper the severity of the force. <u>Hudson</u>, 503 U.S. at 7.

First, the necessity for the use of the restraints in the first instance against Blackmon is hotly contested by the parties. Blackmon has proffered evidence that restraints were applied in response to <u>verbal</u> threats to bang his head. Also, Blackmon has correctly asserted that the record does not clearly reflect the need for restraints on some incidents. For example, on February 9, Blackmon was placed in restraints after getting into an altercation with another juvenile who was not placed in restraints. However, there is no statement in the record that explains the reason for the restraints. There is also evidence that Fitzjarrald instructed the

---

C. Mechanical restraints will be used during the transportation of juveniles to prevent the possibility for escape.

D. The restraint chair will be used after mechanical restraints have been applied and staff have the juvenile physically restrained. The restraint chair will be used in the area where the out of control juvenile is located and the limitations for the use of the restraint chair are the same as mechanical restraints.

JDF staff to use the restraint chair without any clarification as to Blackmon's behavior.  Taylor also instructed JDF staff to use the restraint chair as "punishment" if Blackmon banged his head.  Taylor further instructed staff to place Blackmon in a paper gown for any other incidents.

Second, the parties also dispute the relationship between the need for the mechanical restraints and the amount of force used.  JDF staff kept Blackmon in restraints for prolonged periods of time, despite the fact that Blackmon remained compliant and posed no further threat. The prolonged use of mechanical restraints is contrary to JDF's use of force policy, which prohibits the use of restraints for more than thirty minutes without authorization.  While Sutton's authorization was obtained on some occasions, the record does not demonstrate any need for prolonged restraint on those occasions.  The record merely reflects that Sutton authorized the extended use of restraints without any indication that Blackmon was exhibiting self-harm behaviors while restrained.  On May 1, Hittle left Blackmon in restraints for two hours even though he was not having an emotional outburst.  In addition, Hittle failed to contact any mental health personnel or Sutton for authorization of continued restraint.  On another occasion, and while fully restrained, Blackmon was stripped out of his clothes and forced to wear a paper gown.  Blackmon was also placed in the restraint chair by Tyson and Gutierrez while wearing his paper gown on yet another occasion.

Third, the use of the mechanical restraints resulted in severe mental injuries to Blackmon.  While Blackmon did not suffer a physical injury during the restraints, Blackmon has established through expert

testimony that he suffered a severe mental health injury as a result of his restraints.

Finally, the parties genuinely dispute the extent of the threat to Blackmon's safety and whether any efforts were made to temper the severity of a forceful response. On three incidents, the record does not support the use of mechanical restraints as Blackmon was not physically attempting to harm himself. Moreover, there is no indication in the record that any other method was attempted prior to the use of restraints even though Kansas regulations require that staff use other methods of intervention prior to the use of mechanical restraints. Also, on several occasions, mental health staff were not contacted prior to the decision to place Blackmon in restraints.

Moreover, the court finds the fact that Blackmon was a small child significant. While a restraint chair may be necessary to stop a large, adult male from self-harm, a full body restraint would not appear to be the least restrictive method to keep an eleven year old child from harming himself. The court finds that plaintiff has created genuine issues of material fact regarding defendants' use of mechanical restraints. Viewing the facts in the light most favorable to Blackmon, and applying the Hudson factors, a reasonable trier of fact could conclude that the use of mechanical restraints against Blackmon by the individual supervisor defendants and the approval of the use of the restraints by Sutton, Taylor and Fitzgarrald, constituted the wanton infliction of pain in violation of the Eighth Amendment. Therefore, defendants' motion for summary judgment with respect to the claims against the individual defendants on this claim is denied. Blackmon's motions for partial summary judgment against

defendants on these claims are also denied.

### 2.    Gutierrez

Additionally, Blackmon asserts that Gutierrez' approval of the use of force by Daryl Smith violated his constitutional rights. "Under § 1983, government officials are not vicariously liable for the misconduct of their subordinates," but they are liable for their own culpable involvement. Serna v. Colo. Dept. of Corrections, 455 F.3d 1146, 1151 (10th Cir. 2006). Therefore, Blackmon must establish that Gutierrez committed a deliberate and intentional act which violated Blackmon's constitutional rights. Id. Blackmon has the burden of establishing that (1) Smith applied excessive force and (2) an "affirmative link" ties Gutierrez to the violation of Blackmon's constitutional rights, namely, that Gutierrez (a) actively participated or acquiesced in Smith's application of excessive force and (b) was deliberately indifferent to its application. Id. The court will discuss each element in turn.

On February 15, Smith sat on Blackmon after he refused to do what he was told. As a result, Blackmon had pain on his side and chest. The record does not indicate what Blackmon refused to do. "Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct ..., the conduct itself constitutes sufficient evidence that force was used maliciously and sadistically for the very purpose of causing harm. We will not require inmates to be subjected to the malicious whims of prison guards." DeSpain v. Uphoff, 264 F.3d 965, 978 (10th Cir. 2001). The record is bare of any legitimate penological purpose for Smith's behavior. Therefore, Smith's conduct violated Blackmon's constitutional rights.

-34-

Turning to the second element, there must be an affirmative link to tie Gutierrez to the violation. Blackmon asserts that Gutierrez actively participated in the violation by allowing Smith to sit on him. An affirmative link is established when the supervisor "tacitly authorized the offending acts." <u>Serna</u>, 455 F.3d at 1152. Now, the court must determine if Gutierrez had a culpable state of mind. Deliberate indifference requires that the official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Serna</u>, 455 F.3d at 1154-55.

Blackmon was a child who weighed less than one hundred pounds. Smith was an adult male. Those facts, of which Gutierrez was well aware, support an inference that an adult male could cause serious harm by sitting on the chest of a child. Therefore, a genuine issue of material fact exists as to whether Gutierrez violated Blackmon's constitutional right to be free of the use of excessive force.

Defendants' motion for summary judgment on this claim is accordingly denied. Blackmon's motion for summary judgment on this claim is also denied.

### 3. Kirk Taylor and Joan Fitzgarrald

Blackmon asserts Taylor and Fitzgarrald committed several violations of his constitutional rights. (Docs. 275, 277). With the exception of the excessive force claim, which has been addressed, the court will address the remaining claims in turn.

First, Blackmon argues that Taylor and Fitzgarrald violated Blackmon's right to be provided safe conditions of confinement because Taylor's lack of qualifications to serve as a social worker at JDF

resulted in his inability to perform his job duties effectively. (Doc. 277 at 8). As discussed previously, the violation of regulations and policies, i.e. the regulations which discuss the qualifications of social workers, without a showing that these regulations are protections of federal rights, does not equate with a violation of an individual's constitutional rights. Therefore, Taylor's lack of qualifications or compliance does not automatically result in a violation of Blackmon's rights by Taylor. Blackmon must make a showing that a lack of qualifications violates a federal right and he has failed to do so. Therefore, defendants' motion for summary judgment on this claim is granted and Blackmon's motions for partial summary judgment on this claim is denied.

Second, Blackmon contends that Taylor's failure to perform an appropriate assessment at Blackmon's initial placement resulted in Blackmon's inappropriate placement at JDF and was "paramount to keeping an admitted child safe." (Doc. 277 at 10). Blackmon's statement of facts, however, states that Blackmon had no diagnosable mental health conditions at intake. (Doc. 278 at 35). While Blackmon was anxious, afraid and angry, at intake, Blackmon has failed to establish how an intake assessment would have resulted in 1) a different placement and 2) some sort of mental health plan, especially given the fact that Blackmon was not suffering from a mental illness at that time. Because Blackmon has failed to establish how the lack of an intake assessment violated his constitutional rights, defendants' motion for summary judgment on this claim is granted. Blackmon's motion for partial summary judgment on this claim is denied.

Third, Blackmon asserts that Taylor and Fitzgarrald violated his constitutional rights to be provided a safe confinement by failing to consider transferring Blackmon to the Shelter.  Blackmon asserts that Taylor and/or Fitzgarrald should have discussed his case during weekly population meetings that were held at JDF.  The facts, however, do not support a finding that had Taylor or Fitzgarrald voiced a request for Blackmon it would have been granted.  Taylor and Fitzgarrald were not the ultimate decision makers with respect to placement.  The decision would have been made by the whole committee.  Therefore, Blackmon cannot establish that Taylor's and/or Fitzgarrald's failure to advocate for Blackmon's admission to the Shelter violated his right to a safe confinement.  Importantly, Blackmon offers no authority in support of his position.  Defendants' motion for summary judgment on this claim is therefore granted.  Blackmon's motions for partial summary judgment on this claim is denied.

Fourth, Blackmon contends that Fitzgarrald violated his right to safe conditions of confinement by failing to follow state regulations and JDF policies with respect to suicide watch.  A failure to follow regulations and procedures, however, does not automatically equate with a violation of Blackmon's constitutional rights.  Importantly, Blackmon's position is that this failure was "bad practice" and "poor mental health practice."  (Doc. 275 at 13).  Blackmon fails to articulate how this failure resulted in a violation of his constitutional rights.  Therefore, Blackmon's motion for partial summary judgment on this claim is denied and defendants' motion for summary judgment on this claim is granted.

Finally, Blackmon argues that Taylor and Fitzgarrald violated his

constitutional right to be provided adequate mental health care.[22]  The
Eighth Amendment prohibits the infliction of "cruel and unusual
punishments."  U.S. Const. Amend. VIII.  Deliberate indifference to
a detainee's serious medical needs "constitutes the unnecessary and
wanton infliction of pain . . . proscribed by the Eighth Amendment."
Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d
251 (1976) (citations and internal quotation marks omitted).

Deliberate indifference to a detainee's serious medical needs
encompasses two components.  Mata v. Saiz, 427 F.3d 745, 751 (10th
Cir. 2005) (citing Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir.
2000)).  First, there is an objective component, which requires that
the medical need be sufficiently serious.  Id.

> We have said that a "medical need is sufficiently
> serious if it is one that has been diagnosed by
> a physician as mandating treatment or one that is
> so obvious that even a lay person would easily
> recognize the necessity for a doctor's
> attention." Sealock, 218 F.3d at 1209 (quoting
> Hunt v. Uphoff, 199 F.3d 1220, 1224 (10th Cir.
> 1999) (further quotation omitted)).  Where the
> necessity for treatment would not be obvious to
> a lay person, the medical judgment of the
> physician, even if grossly negligent, is not
> subject to second-guessing in the guise of an
> Eighth Amendment claim. See, e.g., Green v.
> Branson, 108 F.3d 1296, 1303 (10th Cir. 1997).
> Moreover, a delay in medical care "only
> constitutes an Eighth Amendment violation where
> the plaintiff can show the delay resulted in
> substantial harm." Oxendine v. Kaplan, 241 F.3d

---

[22] Additionally, Blackmon contends that Taylor and Fitzgarrald
violated his procedural due process rights by failing to provide
staffings and preventing Blackmon from appealing any disciplinary
actions he received.  Blackmon, however, did not preserve these claims
in the pretrial order.  (Doc. 257).  The pretrial order controls the
scope of all proceedings, see D. Kan. R. 16.2(c), and therefore
Blackmon's procedural due process claims have not been preserved.
Blackmon's motions for partial summary judgment on this ground are
denied.

> 1272, 1276 (10th Cir. 2001) (quotation omitted).
> The substantial harm requirement "may be
> satisfied by lifelong handicap, permanent loss,
> or considerable pain." <u>Garrett v. Stratman</u>, 254
> F.3d 946, 950 (10th Cir. 2001).

<u>Id.</u>

For the purposes of the pending motions, defendants do not dispute the fact that the objective component has been met. (Doc. 295 at 5). Blackmon began exhibiting severe signs of mental health issues within days of his admission to JDF. The second part of the deliberate indifference test involves a subjective component. The question is whether the defendant had a sufficiently culpable state of mind. <u>Id.</u> (citing <u>Estelle</u>, 429 U.S. at 106, 97 S. Ct. 285).

> The subjective component is satisfied if the
> official "knows of and disregards an excessive
> risk to inmate health or safety; the official
> must both be aware of facts from which the
> inference could be drawn that a substantial risk
> of serious harm exists, and [he] must also draw
> the inference."

<u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

Tenth Circuit law recognizes two ways in which a defendant's conduct may amount to deliberate indifference. <u>Sealock</u>, 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly." <u>Id.</u> Alternatively, a prison official may prevent an inmate from receiving treatment or from seeing medical personnel who are capable of evaluating his need for treatment. <u>Id.</u> Blackmon's allegations concern the first type of deliberate indifference.

Blackmon asserts that both Taylor and Fitzgarrald's continued lack of mental health treatment when faced with Blackmon's obvious need of mental health care establishes the subjective prong.

Defendants respond that Taylor and Fitzgarrald did not disregard an excessive risk to Blackmon's health because they relied on Dr. Dorr's evaluation and recommendations. There is a critical flaw in defendants' reasoning, however. Dr. Dorr's assessment was performed in mid-February and Blackmon continued to self-harm, verbalize suicidal intentions and exhibit signs of severe mental illness, which was so severe that he was hospitalized. Taylor and Fitzgarrald did not provide Blackmon with any consistent mental health treatment. The record merely reflects that Taylor and Fitzgarrald saw Blackmon when JDF staff requested an intervention. The mental health notes do not reflect any ongoing mental health treatment by either defendant even though an evaluation in early March recommended mental health treatment and hospitalization.

Moreover, Fitzgarrald and Taylor both failed to follow JDF policies with respect to their roles in proscribing the suicide watches. Even though Blackmon was placed on suicide watch several times during his confinement, Taylor and Fitzgarrald never performed a suicide assessment and also failed to formulate a mental health plan for Blackmon. Blackmon's repeated attempts of self-harm and his severe mental degeneration, which has been recognized by defendants, are facts that both Taylor and Fitzgarrald were aware of. And, given the educational backgrounds and positions of defendants, they should have drawn an inference between the risk of non-treatment and the ultimate harm of mental health deterioration.

Accordingly, resolving factual disputes in favor of Blackmon, "the circumstances suggest that [Taylor and Fitzgarrald] had been exposed to information concerning the risk and thus 'must have known'

about it." Farmer, 511 U.S. at 842.    Therefore, there exists a genuine issue of material fact as to whether Taylor and Fitzgarrald were deliberately indifferent to a substantial risk of harm to Blackmon.    Defendants' motion for summary judgment and Blackmon's motions for partial summary judgment on this claim are denied.

### 4.    Sutton

### i.    Placement

Blackmon asserts that Sutton violated his constitutional right to be free from harm by placing him at JDF instead of the Shelter. Defendants respond that the decision to decline acceptance of Blackmon was made by Lambert.    Additionally, defendants assert that Sutton did not act with deliberate indifference given Blackmon's behavior at the Shelter and his previous attempt to flee to Arkansas.

To prevail on a claim of failure to protect, Blackmon must show he was "incarcerated under conditions posing a substantial risk of serious harm," and that Sutton subjectively knew of and disregarded that safety risk.    Farmer, 511 U.S. at 834, 837. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. at 842 (internal citation omitted).

Turning to the actual placement, Blackmon offers no evidence to support a finding that Sutton had knowledge of a risk of serious harm to Blackmon at the initial placement.    While the state court judge entered an order placing Blackmon at the Shelter, Blackmon has not contradicted defendants' evidence that a placement decision to the

-41-

Shelter or JDF of a detained juvenile was ultimately an administrative decision. Moreover, the record does not support a finding that the judge's placement decision was made because of the serious risk of harm to Blackmon at JDF.[23] When Blackmon arrived at JDF, he did not exhibit any serious mental health issues that may have put Sutton on notice that the placement was not appropriate. Therefore, any decision by Sutton regarding Blackmon's initial placement did not violate Blackmon's constitutional rights.

Blackmon further asserts that Sutton should have moved Blackmon to the Shelter when Blackmon began to self-harm, deteriorate and suffer at the hands of JDF staff. Blackmon must show that Sutton knew of a substantial risk to Blackmon during his detention. In mid-February, Dr. Dorr opined that Blackmon's behavior was the result of his despair, despondency and frustration related to his incarceration. However, Dr. Dorr did not make any recommendations for Blackmon. After his visit with Dr. Dorr, Blackmon continued to self-harm and make verbal threats.

At the time of Blackmon's detention and after the evaluation by Dr. Dorr, Sutton also knew or had reason to know, as previously discussed, of the excessive use of force by JDF staff. A placement at the Shelter would not have resulted in Blackmon's subjection to the restraint chair because the Shelter did not have one on the premises. Given the opinion of Dr. Dorr and the repeated use of force by JDF staff, the court finds that Blackmon has established a genuine dispute of material fact as to whether Sutton had knowledge of a serious risk

---

[23] The record, however, shows that the judge was aware of Blackmon's placement at JDF in February.

of harm to Blackmon and failed to act.

Defendants' motion for summary judgment and Blackmon's motion for partial summary judgment on this claim is denied.

### ii.  Failure to Enforce Regulations and Policies

Finally, Blackmon asserts that Sutton had knowledge of JDF staff's continuous violations of regulations and policies and that she failed to enforce the regulations and policies.  "Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." Serna v. Colo. Dept. of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006).  To establish a claim against Sutton, Blackmon must first show that JDF staff violated the constitution.  Id.  The court has already determined that a failure to follow regulations and policies is not a violation of Blackmon's constitutional rights.  Blackmon, however, must show that a right guaranteed by the Constitution has been violated.  Sutton and JDF staff's failure to follow the procedures and regulations previously set forth in this order are not violations of Blackmon's constitutional rights.

Therefore, defendants' motion for summary judgment on this claim is granted.  Blackmon's motion for partial summary judgment is denied.

### D.  Sedgwick County

With respect to defendant Sedgwick County, Blackmon asserts that JDF policies violated his constitutional rights and failed to comply with state regulations, Sedgwick County violated his right to be free from unreasonable seizure by purchasing the restraint chair, Sedgwick County violated his rights by failing to hire adequate staff and by its acquiescence in repeated violations of regulations and policies.

-43-

A local government may be held liable "when implementation of its official policies or established customs inflicts the constitutional injury." Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 708, 98 S. Ct. 2018 (1978) (Powell, J. concurring).  Second, under certain circumstances, a local government may be held liable under § 1983 for acts of "omission," when such omissions amount to the local government's own official policy. Id. ("[A]cts of omission, as well as commission, may constitute the predicate for a finding of liability under section 1983."). To impose liability on a local government for failure to adequately train its employees, the government's omission must amount to "deliberate indifference" to a constitutional right. Porro v. Barnes, 624 F.3d 1322, 1328 (10th Cir. 2010).  This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id.

### 1.    Policies and Procedures

Blackmon identifies several JDF policies in which he claims failed to comply with state regulations.  (Doc. 269 at 11-13). Blackmon, however, does not identify how these policies demonstrate deliberate indifference to his constitutional due process rights.  In Porro v. Barnes, 624 F.3d 1322 (10th Cir. 2010), the plaintiff was detained in a county jail on an immigration violation.  The plaintiff was tased by a jail officer at some point during his detention.  The plaintiff asserted that this violated his constitutional rights because of the existence of a federal policy that bans the use of

-44-

tasers on immigration detainees.  The Tenth Circuit held that it was the plaintiff's burden to "establish that the <u>Constitution</u>, not just a policy, is implicated."  624 F.3d at 1329 (emphasis supplied).  The Circuit recognized that while a policy may forbid the use of tasers, the Constitution does not go that far.  The Constitution only requires that the use of force be reasonable.  Therefore, a failure to comply with a policy does not equate to deliberate indifference unless the policy violates the Constitution.

Blackmon has not demonstrated how the JDF policies violated his Due Process rights.  Clearly, as discussed previously, Sedgwick County has a duty to provide mental health care.  However, the Constitution does not dictate the means of providing the mental health care.  Therefore, merely failing to adopt the regulations regarding mental health plans and emergency staffings does not violate Blackmon's constitutional rights.  In addition, the Constitution does not require prison officials to refrain from the use of mechanical restraints.  <u>See</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 737-38, 122 S. Ct. 2508 (2002).  The Constitution only requires that the use of force comport with the Eighth Amendment.  Therefore, the JDF policies regarding the use of mechanical force are not unconstitutional merely because they failed to require a staff member to exhaust all other methods of de-escalation, failed to limit use of the restraint chair in certain areas of JDF and because they failed to impose a time limit on the restraints.

Blackmon's motion for summary judgment on this ground is denied and defendants' motion for summary judgment is granted.

**2.    Purchase of the Restraint Chair**

Next, Blackmon asserts that the purchase of the restraint chair violated his right to be free from harm and provided safe conditions of confinement.  As previously discussed, the Constitution does not prohibit the use of mechanical restraints.  Therefore, Blackmon must show that Sedgwick County acted with deliberate indifference in purchasing the chair.  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011).  Blackmon has not met this high standard.  Blackmon's arguments concerning the chair's improper use are not permissive as Blackmon has failed to identify that Sedgwick County was on actual or constructive notice of these potential constitutional violations to the juveniles in its care.  Id. Moreover, the lack of an inquiry by Masterson as to the use of the chair with juveniles is irrelevant given the absence of any evidence that the restraint chair is not appropriate for juveniles.[24]

### 3.  Failure to Train

Next, Blackmon asserts that Sedgwick County's decision to hire and retain Taylor as a Senior Social Worker violated Blackmon's constitutional rights to receive adequate mental health treatment because Taylor was unqualified and did not meet the minimum education

---

[24] It is important to note that, as Blackmon has repeatedly stated, the majority of the population at JDF "towered" over Blackmon. Meaning, most of the juveniles at JDF were probably teenage boys.  At the time of the purchase of the chair, Sedgwick County had no knowledge of the future placement of Blackmon, who was not the typical juvenile at JDF.  Therefore, the court is not convinced that Blackmon has met his burden in establishing that the purchase of the chair for the use at JDF was made with deliberate indifference when the evidence in this case is that the decisions made by JDF staff resulted in a violation of Blackmon's rights.

requirements for the position.

In Board of County Comm'rs v. Brown, 520 U.S. 397, 117 S. Ct. 1382 (1997), the Supreme Court specifically examined the showing required to hold a municipality liable for a single inadequate hiring decision. The Court "observed that basing municipal liability on an official's failure to carefully scrutinize an application for employment poses the greatest risk that a municipality will be held liable for the actions of its employees rather than its own actions, since every injury inflicted by a municipal employee can be traced to hiring in a but-for sense." Barney v. Pulsipher, 143 F.3d 1299, 1308 (10th Cir. 1998). Courts must therefore take greater care and "test the link" between the policymaker's hiring decision and the particular injury alleged. Id. The court must find that Taylor "was highly likely to inflict the particular injury suffered by the plaintiff." Id.

While Taylor did not have a master's degree in social work, Taylor did have a master's degree in Educational Counseling and School Psychology. Also, even though Taylor did not have experience with juveniles, Taylor had worked for several years in another penal institution as a counselor. The court finds that Taylor's lack of a specific degree and work history with children would not put Sedgwick County on notice that Taylor was highly likely to violate Blackmon's constitutional rights. Taylor simply failed to perform the duties of his position. Any employee could do the same, even if he was a trained child social worker.

In addition, Blackmon contends that Sedgwick County failed to require Taylor to attend forty hours of initial training and forty

hours of annual in-service training contributed to the violation of Blackmon's rights. A municipality's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983. <u>See</u> <u>Connick</u>, 131 S. Ct. at 1359. A local government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." <u>Id.</u>

"Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under § 1983." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 390, 109 S. Ct. 1197 (1989). Therefore, Sedgwick County may be liable for its failure to train Taylor if the failure resulted in deliberate indifference to Blackmon's rights. In this case, however, Blackmon does not assert that the training program at Sedgwick County is deficient. Rather, Blackmon asserts that Taylor's failure to attend the training violated Blackmon's constitutional rights. A claim that a single employee was unsatisfactorily trained, however, "will not alone suffice to fasten liability on the city." <u>Canton</u>, 489 U.S. at 390. "It may be, for example, that an otherwise sound program has occasionally been negligently administered." <u>Id.</u> Taylor's failure to attend training, without any indication in the record that this failure was as a result of the action of Sedgwick County, is not sufficient to establish deliberate indifference on the part of Sedgwick County.

Blackmon's motion for partial summary judgment on this claim is denied and defendants' motion for summary judgment is granted.

### 4. Acquiescence in Violations

-48-

Finally, Blackmon asserts that Sedgwick County acquiesced in the ongoing and repeated violations of regulations and policies during Blackmon's detention.  Sedgwick County may be held liable under section 1983 when an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189 (10th Cir. 2010).  "If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." City of St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915 (1988).  There must, however, be evidence of a conscious, affirmative choice on the part of the authorized policymaker. Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S. Ct. 1292 (1986).

The only evidence offered by Blackmon in support of his position that Sedgwick County acquiesced in the constitutional violations is that Sutton kept Masterson "in the loop."  (Doc. 278 at 108).  This is not sufficient to establish that Masterson made a conscious, affirmative choice regarding the treatment of Blackmon by JDF staff.

Defendants' motion for summary judgment on this claim is granted and Blackmon's motion for partial summary judgment against Sedgwick County is denied.

## IV. Conclusion

Defendants' motion for summary judgment (Doc. 283) is granted in part and denied in part.  Defendants' motion for summary judgment regarding Blackmon's claims for violations of state regulations is granted against all defendants.  Defendants' motion for summary judgment on all claims of excessive force against all individual

-49-

defendants is denied.  Defendants' motion for summary judgment on Blackmon's claim against Taylor for failing to perform an appropriate assessment and his claim against Taylor and Fitzgarrald for failing to transfer Blackmon to the Shelter is granted.  Defendants' motion for summary judgment on Blackmon's claim against Taylor and Fitzgarrald for failing to provide adequate mental health care is denied.  Defendants' motion for summary judgment on Blackmon's claim against Sutton for failing to immediately place him in the Shelter in January 1997 is granted.  Defendants' motion for summary judgment on Blackmons' claim for failing to protect Blackmon from harm by transferring Blackmon to the Shelter at a later date is denied. Defendants' motion for summary judgment on all claims against Sedgwick County is granted.

Blackmon's motions for partial summary judgment against all defendants are denied (Docs. 268, 270, 272, 274, 276).

A status conference will be held on September 10, 2012, at 1:30 p.m.  The trial will be held on September 25, 2012, at 9:00 a.m. Counsel must file any <u>Daubert</u> challenges on or before July 31.  The responses must be filed by August 21.  No reply is necessary.  All motions in limine must be on file by August 31.  The responses will be due on September 12.  All proposed jury instructions and voir dire must be filed by September 14.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been

obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  <u>Comeau v. Rupp</u>, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>. The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.  The page limits will not be extended for any reason.  This case has been briefed enough.  It is now time to prepare for trial or to reach a settlement.

     IT IS SO ORDERED.

     Dated this <u> 29th  </u> day of June 2012, at Wichita, Kansas.


<u>s/ Monti Belot</u>
Monti L. Belot
UNITED STATES DISTRICT JUDGE